

AO 91 (Rev. 11/11) Criminal Complaint

AUSA Alec Smith (312) 353-5009

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | CASE NUMBER: | 26-CR-268 |
| v. | | |
| DAYVON WALTON | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about April 21, 2026, at St. Charles, Illinois, in the Northern District of Illinois, Eastern Division, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 2113(a) | by force and violence, and by intimidation to take from the person or presence of a bank employee money belonging to, and in the care, custody, control, management, and possession of BMO Harris Bank located at 300 S. Randall Road in St. Charles, Illinois, the deposits of which were then insured by the Federal Deposit Insurance Company. |

This criminal complaint is based upon these facts:

 X  Continued on the attached sheet.

*Herbert E. Hogberg III*

Herbert E. Hogberg III, Special Agent
Federal Bureau of Investigation

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: May 29, 2026

*Judge's signature*

City and state: Chicago, Illinois

DANIEL P. MCLAUGHLIN, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## **AFFIDAVIT**

I, HERBERT E. HOGBERG III, being duly sworn, state as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been so employed for approximately 24 years. My current responsibilities include the investigation of violent crimes, including, among others, kidnaping, bank robbery, and the apprehension of violent fugitives.

2.     This affidavit is submitted in support of a criminal complaint alleging that Dayvon Walton ("WALTON") has violated Title 18, United States Code, Section 2113(a). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging WALTON with bank robbery, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3.     This affidavit is based on law enforcement reports, prior affidavits in this case, my personal knowledge, information provided to me by other law enforcement agents and circumstances described herein, interviews of WALTON, bank employees and witnesses, review of the bank's video surveillance images, review of images and records produced by 3Si Security Systems, Inc., Flock Safety, the Chicago Police Department ("CPD"), and other law enforcement entities and public

1

records databases, my training and experience, and the training and experience of other law enforcement agents with whom I have consulted.

## PROBABLE CAUSE

4.      On or about April 21, 2026, at approximately 4:57 p.m., three masked men wearing black hooded sweatshirts exited a white Ford Fusion with no license plate and entered the BMO Harris Bank at 300 S. Randall Road in St. Charles, Illinois. The three subjects were armed with firearms. Two of the subjects—one armed with a rifle and another armed with a pistol—forced two bank tellers to the back of the bank and ordered them to open three vaults. When the vaults were opened, the smaller of the two subjects removed numerous stacks of U.S. currency, worth approximately $201,780, and put them into several black trash bags. According to one of the victim tellers, mixed in with the stacks of U.S. currency were also several stacks containing foreign currency. One of the victims could hear that the taller of these two armed subjects was taking directions via headphones connected to a communications device, possibly a phone.







3

5.      According to BMO Harris Bank's Federal Deposit Insurance Corporation ("FDIC") certificate, the deposits of BMO Harris Bank were insured by the FDIC at the time of the bank robbery.

6.      While the bank robbery was going on, the third armed subject was in the bank's lobby where he forced the bank manager and a customer to lay face down on the ground.

7.      The episode ended when the three subjects ran out of the bank together and entered the Ford Fusion which drove eastbound on Oak Street in St. Charles, Illinois. Afterwards, the St. Charles Police Department followed the Ford Fusion via a 3Si tracker that had been concealed in one of the stacks of currency taken by the subjects. St. Charles Police followed this tracker to 507 S. 19th Street in St. Charles, Illinois, where they discovered the Ford Fusion, with Vehicle Identification Number (VIN) 3FA6P0D90LR151283, had been abandoned. Later, the 3Si tracking database showed that the tracker stopped moving over Main Street Bridge in St. Charles, Illinois, which indicated that the subjects may have disposed of it in the Fox River, a river in St. Charles, Illinois.



8. St. Charles Police then analyzed Flock License Plate Reader photos and found one image in which a white Volkswagen SUV bearing Illinois license plate FT56985 was driving across the Main Street Bridge while an arm in black long-sleeved clothing extended from the passenger rear window to throw what appeared to be a 3Si tracker from the Volkswagen. Subsequent checks of Illinois Secretary of State records revealed that the Volkswagen was registered to Individual A, with an address in the 1200 block of N. Laramie Avenue, Chicago, Illinois. The FBI learned through further investigation with the CPD, that Individual A currently resides in the 1600 block of N. Leclaire Avenue, Chicago, Illinois.





9.      Shortly thereafter, a Cook County Sheriff's Police Helicopter found a Volkswagen matching the description parked around the corner from the Leclaire Avenue address on W. Concord Place, Chicago Illinois, just to the west of the intersection of Leclaire Avenue and Concord Place, see image below:



10.      This information was shared with the CPD, and CPD Police Observation Device (POD) camera operators provided photographs to the FBI that had been captured by POD camera 3407W depicting several black males exiting the Volkswagen with black trash bags and entering the apartment building in the 1600 block of N. Leclaire Avenue, see images below:





11.     Based on this information, FBI units established surveillance in the vicinity of the 1600 block of N. Leclaire Avenue and observed a person who matched the description of Individual A exit the building and retrieve something out of the Volkswagen. Later in the evening of April 21, 2026, at approximately 9:50 p.m., the person who matched the description of Individual A and two other individuals exited the building and entered a white Toyota SUV with Texas License Plate VGL 0924 (see image below). This vehicle was stopped by CPD and FBI marked units and the

occupants were detained for questioning. Law enforcement officers identified the individuals detained as: a ride share driver (operating the Toyota), Individual A, Individual B (who also identified themself as a relative of Individual A), and a child.



12.     After stopping the Toyota ride share vehicle, law enforcement officers questioned Individual A, who advised, in summary, that they were going on a trip. The investigating officers explained to Individual A the reason Individual A was being detained, and Individual A gave the officers permission to search Individual A's bags for anything related to the bank robbery at the BMO Harris Bank in St. Charles, Illinois earlier that day. After law enforcement officers did not find anything related to the robbery in Individual A's bags, they reexamined the Toyota ride share vehicle and found a black backpack with yellow zippers. Both Individual B and the ride share driver denied ownership of the backpack. Individual B told law enforcement officers, in summary, that it was not Individual B's backpack, but Individual B did have things

8

in it. When law enforcement officers explained to Individual B that they were planning to obtain a search warrant to go through the backpack, Individual B gave consent to search the backpack's contents, which consent was recorded by CPD Body Worn Camera.

13.     The search of the backpack possessed by Individual B yielded approximately $31,993 in U.S. currency and approximately $2,000 worth of foreign currency. Inside one of the bands of foreign currency was a label imprinted with the words "BMO BANK N.A. BUC 04706 MAR 2 0 2026".



9



14.     On or about May 14, 2026, a Task Force Officer of the Drug Enforcement Agency (DEA) contacted the FBI and provided information from a confidential law enforcement source (CS-1)[1], that Dayvon WALTON ("WALTON") is a member of a crew called the "100K gang" that conducts bank robberies in and around the Chicago, Illinois area. CS-1 provided a photo of WALTON from WALTON's Facebook profile with the username: Lilkingz Walton.

---

[1] CS-1 has been working as a confidential source with the DEA since approximately March 2026. CS-1 is cooperating in exchange for prosecutorial consideration in a separate investigation involving CS-1's unlawful possession of a large amount of illegal narcotics. CS-1 has previously been convicted of narcotics offenses and was on federal supervised release when s/he provided the information in the instant affidavit. CS-1 is still on federal supervised release and has a criminal history including prior convictions for aggravated battery, domestic battery, reckless injury, sell/distribute controlled substance, smuggling, criminal damage, parole violation, and theft. CS-1 has provided information that has been corroborated through surveillance and controlled narcotics transactions, as well as through the events described in this affidavit.



15. CS-1 provided information to the FBI that WALTON and four other associates robbed a BMO Harris Bank in the western suburbs of Chicago, Illinois and gave approximately $30,000 of the proceeds to Individual C and Individual D. CS-1 indicated that Individual D is the sister of Individual B, and Individual B is a relative of WALTON. As described above, law enforcement performed a consent search of a backpack possessed by Individual B on or about the night April 21, 2026, and found approximately $31,993 in U.S. currency and approximately $2,000 worth of foreign currency with a BMO Bank money label. Also in the backpack was a paper copy of Individual C's Illinois Secretary of State identification card.

16. On or about May 17, 2026, CS-1 contacted law enforcement and informed them that CS-1 learned from WALTON that WALTON and his crew were planning on robbing a bank on May 18, 2026.

11

17.     As explained below, during the course of this investigation law enforcement identified two phone numbers, one associated with WALTON, **Subject Phone 1**, and the other associated with Co-Conspirator A (further described below), **Subject Phone 2**. In summary, information provided by CS-1, along with law enforcement's review of recorded calls and text messages between CS-1's phone and **Subject Phone 1** and **Subject Phone 2**, helped to identify **Subject Phone 1** as being used by WALTON and **Subject Phone 2** as being used by Co-Conspirator A.

18.     On or about May 18, 2026, at approximately 10:00 p.m., CS-1 contacted WALTON via **Subject Phone 1**. The phone call was consensually recorded by CS-1 using a voice recorder on a law enforcement owned iPhone. On that call, CS-1 stated to WALTON, "On the next demo, I want to be on that move, bro. Cause I need some paper man. So I can make sure that none of them n----- play you. Look, I can be on point. They don't even have to know I'm on point. I'm just on trail. I'll be on point."[2]

---

[2] This affidavit does not notate every communication between CS-1 and WALTON and others and the communication transcripts of the recorded conversations and text communications are, at times, preliminary, including the FBI's May 28, 2026 recorded interview of WALTON. The majority of communications referenced in this affidavit are recorded and preserved. The following includes a preliminary summary of the communication and may not include the entire communication. The recorded conversations and meetings (the "recorded conversations") have been summarized in this affidavit. I based the language quoted from the recorded conversations throughout this affidavit on a preliminary review of the recorded conversations—and not on final transcripts of the recorded conversations. Any times listed for the recorded conversations are approximate. The summaries of the recorded conversations do not include all statements made or topics covered during the course of the recorded conversations. At various points in this affidavit, I have included in brackets my interpretation of words and phrases used during the recorded conversations. I based my interpretations on the content and context of the recorded conversations, events occurring before or after the recorded conversations, information received from confidential sources, my knowledge of the investigation as a whole, my training and experience, and the training and experience of other law enforcement officers involved in this investigation, including my review of communications, and my discussions with CS-1.

WALTON responded, "We got a studio for tomorrow, so I'll let you know." CS-1 replied, "Early in the morning? Alright, let me know man. So I can get some of that paper. Ok I'm on point. What time you think I should be ready, that way I can get up." WALTON said, "You be up around 7 or 8."

19. Based on my training and experience, conversations with other law enforcement officers, information provided by CS-1, and the investigation to date, I believe that during the above-described conversation, WALTON and CS-1 discussed potential plans to rob a bank on or about May 19, 2026.

20. For identification purposes, law enforcement confirmed the identity of Dayvon WALTON on or about May 22, 2026, after law enforcement showed a Grand Prairie Texas Police Department photograph of WALTON (taken on April 27, 2025) with no identifying marks to CS-1, who confirmed the person in the photograph was WALTON. According to CS-1, CS-1 previously knew WALTON from extensive social contact over the course of many years. Law enforcement also confirmed the identity of Dayvon WALTON by comparing the Grand Prairie Texas Police Department photograph of WALTON (see image below) with the Facebook profile photograph of WALTON provided by CS-1.



21.     CS-1 informed law enforcement that he met with WALTON for breakfast on the morning of on or about May 19, 2026.[3] According to CS-1, during that breakfast meeting WALTON stated, in summary, that his crew was planning to rob a bank on the afternoon of that day, May 19, 2026. WALTON also informed CS-1 that the vehicle his crew had been trying to obtain for use in the robbery had fallen through, that his crew was now looking for a new vehicle, and that they wanted CS-1 to rent a vehicle for them so they could use it in the robbery.

22.     According to CS-1, the leader and "mastermind" of the 100K gang is a white male known under a certain alias name, which, as explained below, law enforcement has now identified as an alias for Co-Conspirator A. Following the breakfast meeting on or about the morning of May 19, 2026, CS-1 observed WALTON use **Subject Phone 1** to place an unrecorded FaceTime call to Co-Conspirator A on **Subject Phone 2.** During that FaceTime call, CS-1 also spoke directly with Co-Conspirator A via **Subject Phone 2** and using **Subject Phone 1**, with WALTON present. According to CS-1, the FaceTime conversation, in summary, was about the prospect of CS-1 renting a car for use by WALTON and Co-Conspirator A.

23.     On the same day, on or about May 19, 2026, CS-1 had text message communications with Co-Conspirator A via **Subject Phone 2** regarding CS-1 renting a car for use by WALTON and Co-Conspirator A.

24.     For identification purposes, law enforcement confirmed the identity of

---

[3] Due the volatile nature of these events, this, and other certain conversations between CS-1 and WALTON were not able to be recorded.

Co-Conspirator A on or about May 19, 2026, after law enforcement showed an Illinois Secretary of State photograph of Co-Conspirator A  and a second photograph of Co-Conspirator A with no identifying marks to CS-1, who confirmed the person in both photographs was Co-Conspirator A. CS-1 confirmed that s/he recognized Co-Conspirator A as the same individual with whom he discussed renting a vehicle for use by WALTON and Co-Conspirator A using **Subject Phone 1** and **Subject Phone 2**. The FBI was already familiar with Co-Conspirator A's appearance as he was a subject in FBI investigations of at least five BMO Harris Bank locations in the Chicago, Illinois area. Co-Conspirator A was recently released on parole from Illinois Department of Corrections, on or about January 9, 2026, following his confinement for another robbery. As of the morning of on or about May 28, 2026, Co-Conspirator A had an active and serviceable parole warrant for his arrest issued by the Illinois Department of Corrections ("IDOC").

25.     On or about May 19, 2026, pursuant to the above-described FaceTime and text message communications on **Subject Phone 1** and **Subject Phone 2**, CS-1, at the direction of the FBI, rented a car for use by WALTON and Co-Conspirator A in preparation for a robbery. Law enforcement officers placed a tracker in the rented car, which CS-1 provided to WALTON at approximately 3:00 p.m. FBI surveillance teams monitored known locations for Co-Conspirator A and communications between CS-1, WALTON using **Subject Phone 1**, and Co-Conspirator A using **Subject Phone 2**. FBI did not observe an attempted bank robbery by WALTON or Co-Conspirator A on May 19, 2026.

15

26. On or about May 20, 2026, pursuant to further communications between CS-1, WALTON using **Subject Phone 1**, and Co-Conspirator A using **Subject Phone 2**, CS-1, at the direction of the FBI, again rented a car for use by WALTON and Co-Conspirator A in preparation for a robbery. Law enforcement officers placed a tracker in the rented car, which CS-1 provided to WALTON at approximately 7:00 a.m. FBI agents and Task Force Officers tracked and surveilled the rented car to various locations in and around Chicago, Illinois for a period of approximately eleven (11) hours. FBI did not observe an attempted bank robbery by WALTON or Co-Conspirator A on May 20, 2026.

27. On or about May 21, 2026, at approximately 3:00 p.m., CS-1 reported that Co-Conspirator A contacted CS-1 over an unrecorded FaceTime call and asked CS-1 to rent another rental car. Co-Conspirator A also asked that CS-1 bring the car directly to him because WALTON "is under him and he going to get it done." At around the same time, Co-Conspirator A sent a series of text messages to CS-1 indicating that Co-Conspirator A was angry with CS-1 because CS-1 had not answered Co-Conspirator A's calls. At approximately 8:00 p.m., CS-1 sent the following message to the FBI: "[Co-Conspirator A] keep calling trying to figure out when I can get him a rental what should I tell him?".

28. On May 22, 2026 and May 27, 2026, the FBI received court authorized federal search warrants to help the FBI track the location and other information associated with **Subject Phone 1**, believed to be used by WALTON, and **Subject Phone 2**, believed to be used by Co-Conspirator A.

29.     FBI surveillance and analyst teams were able to follow the movements of **Subject Phone 1** (associated with WALTON) and **Subject Phone 2** (associated with Co-Conspirator A).

30.     According to CS-1, as of on or about May 26, 2026, Co-Conspirator A was still very anxious to procure a vehicle for use in a potential robbery and had been attempting to enlist the help of Co-Conspirator A's acquaintances, including WALTON or WALTON's friends/family, to obtain such a vehicle.

31.     On or about the morning of May 28, 2026, FBI surveillance teams identified Co-Conspirator A coming out of a house and getting into a black Cadillac Escalade with Illinois License Plate FH80153. FBI surveillance teams, based on surveillance, suspected WALTON was also in the Cadillac Escalade.

32.     As stated above, Co-Conspirator A had an active and serviceable IDOC parole warrant for his arrest, and FBI units initiated a traffic stop of the Cadillac Escalade at approximately 3:00 p.m., on or about May 28, 2026.[4]

33.     WALTON and two other individuals fled the Cadillac Escalade, and Co-Conspirator A remained in the vehicle. Co-Conspirator A remained in the vehicle despite FBI's verbal and tactical efforts to have Co-Conspirator A exit the vehicle. In an effort to gain compliance, FBI Operators deployed diversionary devices on multiple occasions. Co-Conspirator A refused to comply with operator commands and efforts. While still refusing to comply, Co-Conspirator A began firing a weapon at law enforcement officers on the scene, and agents returned fire striking Co-Conspirator

---

[4] Available information is preliminary and summary.

A. Agents made efforts to aid Co-Conspirator A who was pronounced deceased shortly thereafter.

34. On May 28, 2026, WALTON was detained and subsequently interviewed by the FBI. Following *Miranda* warnings, WALTON indicated that he understood his rights and wished to speak with the interviewing agents without a lawyer present. During a recorded interview, WALTON confirmed his involvement in an April 6, 2026 attempted robbery and in the April 21, 2026 bank robbery described above.

35. In summary, WALTON viewed photograph still shots undersigned agent displayed on a mobile device. WALTON identified photographs of himself and Co-Conspirator A from an attempted bank robbery that occurred on or about April 6, 2026 in Niles, Illinois.

36. When asked about his involvement in the April 21, 2026 bank robbery described above, WALTON initially denied any involvement. When confronted with details and photographs of the April 21, 2026 bank robbery, WALTON confirmed he was at the bank robbery, entered the bank, and carried a handgun that he did not display. WALTON further confirmed that Co-Conspirator A had told WALTON in advance that they were going to commit a bank robbery on April 21, 2026 and WALTON was able to identify Co-Conspirator A in one of the still shot photograph images of the April 21, 2026 bank robbery. In viewing the still shot photograph image of the three bank robbery suspects involved in the April 21, 2026 bank robbery, who were all masked, WALTON advised he was not sure which one he was but confirmed he was one of the three suspects in the photograph.

18

## CONCLUSION

37.     Based on the foregoing facts, I respectfully submit that there is probable cause to believe that, on or about April 21, 2026, Dayvon WALTON by force and violence, and intimidation, to take from the person and presence of a bank employee money belonging to, and in the care, custody, control, management, and possession of BMO Harris Bank located at 300 S. Randall Road in St. Charles, Illinois, the deposits of which were then insured by the Federal Deposit Insurance Corporation, in violation of Title 18, United States Code, Section 2113(a).

FURTHER AFFIANT SAYETH NOT.

*Herbert E. Hogberg III*

HERBERT E. HOGBERG III, Special Agent
Federal Bureau of Investigation

SWORN TO AND AFFIRMED by telephone May 29, 2026.

*Daniel P. McLaughlin*

Honorable DANIEL P. MCLAUGHLIN
United States Magistrate Judge